# United States District Court
## Northern District of Alabama
## Southern Division



| | |
|---|---|
| **Sheila J. Currier,** | ] |
| | ] |
| Plaintiff, | ] |
| | ] |
| vs. | ] CV-00-N-3148-S |
| | ] |
| **Alabama Power Company,** | ] |
| | ] |
| Defendant. | ] |



### Memorandum of Opinion

## I.    Introduction

This is a federal question case. 28 U.S.C. § 1331 (2001).  Plaintiff, a former employee

of defendant Alabama Power Company ("APCo"), filed a two-count complaint in which she

alleged  discrimination  and  constructive  discharge  in  violation  of  Title  VII,  and

discrimination in violation of the Age Discrimination in Employment Act.  The court now has

for consideration defendant's motion for summary judgment, filed September 7, 2001 [Doc.

# 24].  The issues have been briefed by both parties and are now ripe for decision.  Upon

due consideration, the motion will be granted.

## II.   Facts[1]

### A.   Background

Defendant APCo has business customer services offices that primarily deal with customer inquiries, collect payments for power bills, and read meters. Booker Dep. at 20. Since at least as early as 1978, the business offices have been organized into districts. Currier Dep. at 41. Currier, who was born on September 19, 1943, was hired as a cashier in APCo's Huffman business office in 1969. *Id.* at 7, 27; Dewberry Aff. at Ex. A. In 1971, she was transferred from the Huffman business office to APCo's Gardendale business office. Currier Dep. at 30. In 1973, Currier's title changed to Customer Service Representative. *Id.* at 29; Dewberry Aff. at Ex. A. The plaintiff was moved to APCo's Customer Service Center in Birmingham in 1973. Currier Dep. at 32. In the Customer Service Center, Currier received telephone calls, handled questions from customers, and assisted customers. *Id.* at 32-33.

Currier bid on and received a Local Office Representative I position in APCo's Warrior business office in 1974. Currier Dep. at 35-36; Dewberry Aff. at Ex. A. In 1978, she received an upgrade in classification to Senior Local Office Representative. Currier Dep. at 39-40; Dewberry Aff. at Ex. A. In 1981, while still in the Warrior office, Currier received another upgrade in classification to the Local Representative position. Currier Dep. at 41; Dewberry Aff. at Ex. A.

---

[1] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

A restructuring of the districts and business offices began in 1989.  Sparks Dep. at 15.  In connection with that restructuring, APCo offered a severance package in order to reduce management, and several district managers elected to opt into the voluntary severance package.  *Id.* at 15.  APCo combined the Gardendale, Huffman, and Leeds districts and closed the Warrior office, combining its territory with the Gardendale office. *Id.* at 8, 15-16; Currier Dep. at 46; Gilbert Dep. at 16, 20.  As a result, Currier was transferred to the Gardendale office and her title became Senior Customer Accounting Representative. Currier Dep. at 43-47; Gilbert Dep. at 20; Sparks Dep. at 8; Dewberry Aff. at Ex. A.  Although her pay remained the same, her grade was reduced from level thirteen to level eleven because there was not a grade thirteen classification in the Gardendale office at the time. Gilbert Dep. at 124; Sparks Dep. at 8; Currier Dep. at 50.

Scott Gilbert was the District Office Manager when Currier first went to Gardendale. Currier Dep. at 52. Henry Carter, who was hired by Scott Gilbert, was the supervisor there.[2] *Id.*; Gilbert Dep. at 23.  When Currier first came to the Gardendale office, she took over the final bill collections, waited on customers, and relieved cashiers.  Currier Dep. at 50.  If Henry Carter was ever out of the office, Currier would perform his duties.  *Id.* at 181.

In 1992, another severance package was offered to downsize district manager positions.  Sparks Dep. at 18, 24; Gilbert Dep. at 16-17.  The district manager position in Gardendale was eliminated and Gardendale was assigned under the leadership of the

---

[2] All of the supervisors at the Gardendale office prior to Henry Carter were males in their twenties or thirties.  Gilbert Dep. at 152.

3

Huffman office and the East Jefferson District Manager.[3]   Gilbert Dep. at 16-18, 63.  As part

of the management downsizing through attrition, the Huffman Meter Reading Supervisor

accepted the severance package, and Henry Carter, the Gardendale Business Office

Supervisor, was transferred to the Huffman Office as the Meter Reader Supervisor.  Carter

Dep. at 38; Sparks Dep. at 18.  After the reorganization, there was no slot for a supervisor

position in Gardendale, and the decision was made to use the supervisor slot for the

Huffman office.  Gilbert Dep. at 59-60, 64-65.  After Henry Carter was transferred to Huffman,

that office had approximately eighteen employees including supervisors, whereas

Gardendale had approximately eleven employees including supervisors.[4]  Sparks Dep. at

44-45.

By memorandum dated May 28, 1992, from Scott Gilbert to John Sparks, District

Accounting Manager of East Jefferson, Gilbert requested that Currier's classification be

upgraded to Customer Service Specialist.  Gilbert Dep. at Ex 1; Sparks Dep. at 39.  In June

1992, Currier received an upgrade in classification from Customer Service Representative

to Customer Service Specialist, position she retained until her retirement.  Sparks Dep. at

39 and 40.  As a Customer Service Specialist, Currier's job duties included providing

technical support to the less-experienced Customer Service Representatives, talking with

---

[3] In 1992, the East Jefferson District consisted of the Gardendale, Huffman, and Leads business offices. Sparks Dep. at 6.  Huffman was the largest office in the East Jefferson District.  Sparks Dep. at 7.  In 1992, Huffman had approximately 47,000 customers, whereas Gardendale had approximately 24,000 customers.  Sparks Dep. at 43.

[4] In addition to transferring Henry Carter to Huffman, there was at least one other example of management downsizing during this period.  Sparks Aff. ¶ 6.  When Bob Holly was transferred from the Huffman Office Operations Manager position to another position outside the division, he was not replaced; rather, Vince Lavoy, Operations Manager in Gardendale, was transferred to the Huffman office.  *Id.*

4

customers that wanted to speak to someone other than the person they had talked to at the counter, and performing other job duties assigned to her by the Office Manager. *Id.* at 9.

Around 1996, Currier bid on a Supervisor position in the Huffman office, a position Ron Booker encouraged her to seek. Currier Dep. at 88-89 and 94. A female, Marilyn Freeman, was selected for the Huffman office supervisor position on which Currier bid. *Id.* at 93. Although there were other Customer Service Supervisor openings, Currier never bid on them because she was "content where [she] was and [she] didn't want to make another move." *Id.* at 94-95. Currier retired on March 31, 2000. *Id.* at 88.

## B.   Henry Carter as Comparator

Currier believes that she should have been paid the same as Henry Carter, who she alleges is her "comparator". *Id.* at 127. Henry Carter graduated with an accounting degree from the University of Alabama and was hired by APCo in 1984 as a Junior Accountant, a position that was designed to train employees to be supervisors in the business customer services offices. Carter Dep. at 8, 10-11; Carter Aff. at ¶ 6. Henry Carter received the Customer Service Supervisor position in the Gardendale Business Office in 1986. Carter Dep. at 12. When he first became a Customer Service Supervisor in Gardendale, Carter had problems with his supervisory responsibilities, but according to the Gardendale Business Office Manager Scott Gilbert, Carter "did a big job of improving." Gilbert Dep. at 39. In fact, Gilbert "hated" to see Carter transferred to the Huffman office. *Id.* at 40.

In his deposition, John Sparks testified that after Henry Carter transferred to the Huffman office, he expected Currier to take care of the difficult customers and provide technical support to the other customer service representatives in the Gardendale office.

5

Sparks Dep. at 31. John Sparks further testified that Henry Carter had primarily performed clerical duties in the Gardendale office, and that the Area Accounting Manager would take on any supervisory responsibilities that Carter might have been performing. *Id.* at 31-32. Prior to being transferred to the Huffman office, Henry Carter wrote down his job duties as the Gardendale office supervisor and gave them to Currier. Currier Dep. at 62, Ex. 1; Gilbert Dep. at 51-52. Upon Carter's transfer, Currier moved into his former Gardendale office and began to perform many of the duties that he had listed in addition to her previous duty of handling the final bills. Currier Dep. at 59, 72-73.

Prior to his transfer to the Huffman office, Carter or Scott Gilbert would approve appliance sales and special payment plans for customers. *Id.* at 52-53. After Carter was transferred to the Huffman office, Currier still had to receive approval from Scott Gilbert for credit approvals and for special arrangements made for final bills if she was unsure that the payment arrangement "would fly." *Id.* at 63. She did have the authority, however, to approve appliance sales as a supervisor would. *Id.* at 63; Carter Dep. at 98. Prior to Carter's transfer to the Huffman office, Carter participated in the budget process in the Gardendale Business Office, which Currier did not do after his transfer.[5] Gilbert Dep. at 109-115; Carter Dep. at 56-57; Sparks Dep. at 13. While Henry Carter was the supervisor in the Gardendale office, he completed evaluations on employees, including meter readers. Currier Dep. at 66-67; Booker Dep. at 46; Gilbert Dep. at 46-47, 52-53; Carter Dep. at 24-25.

---

[5]In her deposition, Currier stated that Carter was not involved in preparing the budget. However, not only did Carter testify that he provided numbers to his superiors for budgetary purposes, several others also testified that he did so. Significantly, Currier does not dispute that Carter participated in the budget process while in Gardendale in her response to defendant's statement of facts. *See* Pla.'s Resp. to Def.'s Statement of Facts at ¶ 81.

6

In so doing, he would assess each employee's performance, complete the evaluation, go over the evaluation with the employee, and provide feedback to the employee with respect to his or her performance. Carter Aff. ¶ 4. Currier never completed performance evaluations on employees in Gardendale, though the record indicates that she may have provided some input to her managers as they evaluated the other employees. Currier Dep. at 67, 138-39; Booker Dep. at 46, 108-109; Gilbert Dep. at 46-47, 52-53, 101, 147-148; Sparks Dep. at 13.

As a supervisor in the Gardendale office, Carter had the authority to formally discipline Gardendale employees,[6] though Currier, in her deposition, testified that she did not believe that he ever actually disciplined any employees while at the Gardendale office. Booker Dep. at 46; Currier Dep. at 68-69. Because Currier was not a Supervisor, she was never given the authority to discipline employees. Dewberry Aff. at ¶ 8; Booker Dep. at 46, 55,108-09; Sparks Dep. at 13; Sparks Aff. at ¶ 5. On one occasion, Currier was asked by Booker, the Gardendale Office Manager at the time, to talk to an employee who had performance problems; however, Currier never actually did the counseling. Currier Dep. at 139-40; Booker Dep. at 109-10. Finally, Carter participated in union grievances involving meter readers, while Currier was never involved in any such matters. Currier Dep. at 68-69; Gilbert Dep. at 106-07.

Currier did not supervise the meter readers while she was in Gardendale, though she did a lot of the same things that the Gardendale office manager did with them, including

---

[6] APCo's formal discipline procedure involves written documentation and includes written warnings and action up to and including discharge. Dewberry Aff. ¶ 8.

following up with the meter readers, correcting meter reading routes, marking collection documents and giving them to the meter readers, and dealing with customer complaints about the meter readers. Booker Dep. at 126-130. She did not give them performance appraisals, however. *Id.*

The Meter Reader Supervisor position in Huffman, the job to which Carter was transferred, was a different position from the position of Business Office Supervisor he formerly held. Gilbert Dep. at 40; Carter Dep. at 58-63. As the Huffman Meter Reading Supervisor, Carter supervised the meter readers, loaded routes into hand held computers, handled any unread meters, handled customer calls, and made arrangements to have meters read. Gilbert Dep. at 41, 43. Moreover, Carter assumed the responsibility for meter reading for the entire district, including the day-to-day routing of the meter readers, the coordination of the meter readers, and ensuring that there was an adequate number of people to get meters read in Huffman, Gardendale, and Leeds. Sparks Dep. at 19. Carter provided some customer service support for the Huffman office as needed. *Id.* Carter would also occasionally ride on the trucks with the meter readers, Carter Dep. at 39-40, 61., and completed performance evaluations on them. *Id.* at 56.

Currier did supervise some employees while she worked in the position of Customer Service Specialist and she performed management duties. Gilbert Dep. at 66, 119-21. She handled any problems that arose in the Gardendale office while Scott Gilbert was out of the office, which occurred on a daily basis for at least an hour or two. *Id.*; Currier Dep. at 128. Prior to Gilbert's retirement, Currier provided counseling, and coaching to meter readers and employees in the accounting department. Gilbert Dep. at 122-23. In fact, Gilbert

8

testified that these employees leaned on Currier as a supervisor. *Id.* The record also supports the fact that Currier provided training to employees in the accounting department after 1995. Booker Dep. at 109. The plaintiff interviewed employees while she was a customer service specialist in Gardendale. Currier Dep. at 127.

While going over her employee performance reviews with Scott Gilbert (prior to 1995) and then Ron Booker (Gardendale Office Manager after Gilbert's retirement), Currier mentioned her desire to be a supervisor, and both Gilbert and Booker separately told her that they were sorry they were not able to give her the supervisor classification. *Id.* at 96-97. Gilbert advised his superiors, including Gail Amburgy, John Sparks, and Bill Goodman, on many occasions that Currier was due for a promotion and that she was performing the same duties that supervisors had performed in Gardendale for years.[7] Gilbert Dep. at 66, 74-77, 95. According to Gilbert, the duties that Carter performed at Huffman were less intense and less demanding than the job Currier was performing. *Id.* at 91. Thus, he suggested to his superiors that Carter's position should not be considered a supervisory position anymore so that a supervisor slot could be opened for Currier, but his suggestion was dismissed. *Id.* at 91-92. Eventually, within the last six months of his employment with APCo, Gilbert stopped pressing the issue concerning promoting Currier into the supervisor position because he was told that there was not any sense in pursuing it. *Id.* at 87-90.

_____

[7] Scott Gilbert spoke with Jim Ivey, Birmingham Division Accounting Manager, on three occasions about promoting Currier into a supervisor position, but Ivey was dismissive of the issue on each occasion. Gilbert Dep. at 87-88. He spoke with Bill Goodman about "feeling like that the Gardendale office had not been treated fairly in the fact that the supervisor slot had been taken from there. The position had been held out there for eight or nine years and it had been taken from there to Huffman, and Sheila was new in the job yet they wouldn't give her the title or the money." *Id.* at 95. Goodman did not respond other than stating that APCo did not have a slot in Gardendale anymore and that they had to consider the budget. *Id.* at 95.

9

Ron Booker, who was Gardendale Business Office Manager from 1995 until September 2000, asked Jim Ivey, then the Division Manager of Customer Service, if he could promote Currier to the Customer Service Supervisor position. Booker Dep. at 9-10, 18-19, 25, 37-39. Ivey told Booker that Gardendale did not need a Supervisor. *Id.* at 79. In addition, Ivey told Booker that the promotion would be a new job in the Gardendale office that did not exist, which meant that the position would have to be posted pursuant to APCo's formal bid process. *Id.* at 39. If the Supervisor position was posted through the bid procedure, a selection committee would be appointed to select the most qualified candidate. *Id.* at 41-42. Although he had no concern that she would not qualify for the position, Booker did not want to post the position through the bid procedure because the selection committee would have to select the most qualified candidate. *Id.* at 98-99. Booker was unsure that Currier would actually receive the position, and if that were the case, Currier might actually get displaced from her Customer Service Specialist position in Gardendale. *Id.* at 39-40, 98-100, 115.

### C.   Currier's Retirement and the Present Law Suit

Currier retired because she was "ready" to retire for several reasons, including: (1) her husband was retired; (2) he wanted her to retire; (3) she was ready to completely stop working; and (4) she was informed by her financial planner that she could retire. Currier Dep. at 99-101. On February 11, 2000, Currier wrote Ron Booker an e-mail stating, "After thirty one years with Alabama Power Company, I have elected to take early retirement. My last day at work will be March 31, 2000. I've enjoyed it all. 'Thanks for the memories'." Booker Aff. at Ex. A. Currier stated in her deposition that if she had been placed in a

10

supervisor position, then she probably would have waited until she was 59½ years old before she retired. Currier Dep. at 100. However, she then testified that she did not know if she would have waited longer to retire if she had been a supervisor. *Id.* Although Currier's complaint alleges that she was constructively discharged, Currier testified in her deposition that her conditions were not "so intolerable that [she] wouldn't stay on." *Id.* at 134.

Prior to Currier's retirement, Ron Booker, Gardendale Office Manager, asked Currier how she thought her job should be posted, and Currier stated that "for the good of the office" a supervisor job should be posted to fill her place. *Id.* at 98, 107, 109. Currier thought it would be good for the office to have a supervisor because there were times when customers would ask to speak with a supervisor about a complaint or issue, and when the cashiers or other employees sent the customers to Currier, Currier would have to tell the customer that she was not a supervisor. *Id.* at 108. The decision to post a supervisor position in the Gardendale office was made by the division management, including Gary Grooms, Division Manager-External Affairs, Larry Kiker, Division Manager of Customer Service,[8] and Ron Booker, Gardendale Office Manager. Booker Aff. ¶ 9. Scott Gilbert asked Ron Booker how he was able to get a supervisor position suddenly for the Gardendale office, and Booker responded that it just happened and that he was told that was how it was going to be. Gilbert Dep. at 117-18.

A female, Terri Reeves, received the Supervisor position in the Gardendale office. Currier Dep. at 111. Terri Reeves, Henry Carter, and the two prior Gardendale office

---

[8]Jim Ivey retired in 1998, and Larry Kiker took his place. Booker Aff. at ¶ 9.

Supervisors prior to Carter all had college degrees. *Id.* at 111; Carter Dep. at 8; Carter Aff. ¶ 7. Because there were so many applicants for the Gardendale Customer Service Supervisor position, the APCo Screening Committee used a college degree as a screening requirement for the position; thus any applicant without a college degree was rejected and was not given an interview. Currier Dep. at 113; Booker Dep. at 100-01. Currier admits that if she had been one of the applicants for the Gardendale Customer Service Supervisor position, she would not have gotten the position because she did not have a college degree. Currier Dep. at 113-14.

When asked in her deposition why she believed she was not made a supervisor, Currier testified, "It seemed obvious to me that since I was doing the same job that Henry [Carter] had been doing and every person in that job at the Gardendale office had been a male, that it was because I was female" and "Well, budget, keeping budget in mind, they were getting the job done and not having to pay supervisor salary." *Id.* at 102-03. Currier does not have any other facts or evidence to suggest or support her allegation that her being female had something to do with why she was not made a Supervisor. *Id.* at 105-06. Currier also testified her age might be a possible reason she was not made a Supervisor because she was "much older than any of [her] supervisors." *Id.* at 103-04. Currier has no other facts or evidence to support her allegation that her age was a factor in her not being a Supervisor. *Id.* at 106. Other than not receiving the Customer Care Supervisor position, Currier does not believe she suffered any type of mistreatment by APCo while she was at Gardendale. *Id.* at 116.

## III.    Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (*quoting* Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (*quoting* Fed. R. Civ. P. 56(e)).

After the plaintiff has properly responded to a motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a

13

reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV.   Discussion

Though not entirely clear from the parties' submissions, it is apparent to the court that plaintiff's claims are based on the failure of defendant to pay her at a rate comparable to Customer Service Supervisor, even though, she alleges, she performed the same duties. Plaintiff does not appear to claim that defendant discriminated against her by failing to promote her to that position.[9] Each of plaintiff's claims, discrimination in violation of Title

---

[9]In her complaint, under the Title VII count, plaintiff alleges that "[s]he was denied the salary and raises for the position of Customer Service Supervisor for which she was qualified and performed from June of 1989. Although Plaintiff complained, she was continually denied the appropriate salary and raises for the job responsibilities she held." Complaint at ¶ 15. Under the age discrimination count, plaintiff alleges that "she was not provided the appropriate pay, raises and benefits of the Customer Service Supervisor . . . ." *Id.* at ¶ 19. No where in her complaint does she complain that she was improperly denied a promotion to the position of Customer Service Supervisor. While it appears to be a fine distinction, case law indicates that a plaintiff is required to establish a different prima facie case depending on whether he or she proceeds under a wage discrimination theory or a failure to promote theory. *Compare Meeks v. Computer Associates International*, 15 F.3d 1013, 1019 (11th Cir. 1994), *with Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000).

VII, discrimination in violation of the Age Discrimination in Employment Act, and constructive discharge in violation of Title VII, are discussed below.[10]

## A.    Title VII Discrimination

In order to succeed at summary judgment on a claim of discrimination based on Title VII, a plaintiff must show purposeful discrimination on the part of the defendant. *See Baldwin v. Birmingham Bd. of Educ.*, 648 F.2d 950 (5th Cir. 1981). Purposeful discrimination can be shown by either direct or circumstantial evidence. *See Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 701 (11th Cir. 1998). Direct evidence is evidence that, "if believed, would prove the existence of a fact [in issue] without inference or presumption." *Carter v. Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989). Should a plaintiff produce direct evidence that discrimination motivated the employment decision complained of, the defendant must prove that the same employment decision would have been made in the absence of the discriminatory motivation. *See id.* The court points out, however, that "[f]or statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision." *Trotter v. Board of Trustees of the Univ. of Ala.*, 91 F.3d 1449, 1453-54 (11th Cir. 1996).

In the absence of direct evidence, the court applies the *McDonnell Douglas/Burdine* framework established by the Supreme Court in gender-based, wage discrimination claims. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1528 (11th Cir. 1992); *see McDonnell Douglas v. Green*, 411 U.S. 792 (1973); *Texas Dep't of Community Affairs v.*

---

[10] Defendant initially argues that summary judgment is appropriate due to the running of the applicable statute of limitations. By resolving defendant's motion in the manner set forth herein, the court does not reach this issue.

15

*Burdine*, 450 U.S. 248 (1981). Accordingly, a plaintiff must demonstrate the defendant's discriminatory intent by establishing a prima facie case of discrimination. *See Berman*, 160 F.3d at 701-02. In a wage discrimination claim, the plaintiff makes out a prima facie case if she demonstrates "that she occupies a job similar to that of higher paid males." *Meeks v. Computer Associates International*, 15 F.3d 1013, 1019 (11th Cir. 1994).

Once the plaintiff has shown a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the complained of action. *See Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000). Should the defendant articulate such a reason, "the plaintiff must then establish that the defendant's proffered reasons for the employee's rejection were pretextual." *Id.* In attempting to establish pretext, the Eleventh Circuit recently noted that

A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.

*Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). In analyzing the plaintiff's evidence of pretext, "[t]he district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (citation and internal quotation marks omitted).

16

Generally, summary judgment is inappropriate if the plaintiff is able to both establish a prima facie case of discrimination and offer evidence from which a reasonable jury could find that the employer's proffered, non-discriminatory reasons for its employment action are not worthy of credence. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146-47 (2000). However, as the Supreme Court has also noted:

> [T]here will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. . . . Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

*Id.* at 148-49.

### 1.    **Plaintiff's Prima Facie Case**

Turning to the evidentiary record, the plaintiff has not put forward any direct evidence of discrimination. Thus, she must prove a circumstantial case under the framework discussed above. For two separate reasons, it is clear that the plaintiff's gender discrimination claim is due to be dismissed. First, she has failed to establish a prima facie case of gender-based, wage discrimination. Second, even if she were to have established a prima facie case, she has failed to rebut defendant's legitimate, non-discriminatory reasons for its different treatment of her alleged comparator, Henry Carter.

17

To make out a prima facie case of discriminatory wage disparity, plaintiff must show that a male in a similar job was paid more than she was. Plaintiff argues that Henry Carter, who was a supervisor at the Gardendale office prior to 1992 and the Meter Reading Supervisor at the Huffman office thereafter, is the appropriate comparator for her discriminatory treatment claim. However, plaintiff has clearly failed to carry her burden because she cannot show that her job as Customer Service Specialist and Carter's jobs were similar, such that a wage disparity must have been discriminatory.

As for the standard of similarity necessary to satisfy the plaintiff's burden, defendant has cited to *Holifield v. Reus*, 115 F.3d 1555, 1562 (11th Cir. 1997), for the proposition that comparitors must be "similar in all relevant respects." Plaintiff seems to agree that *Holifield* provides the proper standard when she states in her brief that "[h]er duties were similar to Mr. Carter's in all relevant respects which Defendants point out as the test as set out in *Holifield* . . . ." Pla.'s Br. at 4. While the court is not altogether convinced that the standard enunciated in *Holifield* is the proper standard for the present case, as the court in that case was addressing a different theory of discrimination under Title VII, the court is convinced that there is simply no way that a reasonable jury could find that the jobs performed by plaintiff and Henry Carter were sufficiently similar.

While there is some commonality between Currier's duties as Customer Service Specialist and those of Henry Carter while he was a supervisor at the Gardendale office, defendant points to four primary differences between their respective duties, which defendant argues "are the heart of being a supervisor." Def.'s Br. at 12. As a supervisor, Carter was authorized to administer formal discipline to employees at the Gardendale

18

office. While Currier disputes whether he ever actually performed any discipline, the fact that Carter was charged with this responsibility is undisputed. It is likewise undisputed that Currier had no authority whatsoever relating to formal discipline. Defendant further points out that Carter completed employee evaluations on the meter readers while Currier, at most, provided her supervisors with her opinions of employees as the supervisors prepared evaluations. It is undisputed that the completion of employee evaluations includes a number of tasks, including assessing the employee's performance, completing the evaluation, going over the evaluation with the employee, and providing feedback to the employee with respect to his or her performance. A third difference between Carter's and Currier's duties is that Carter was involved in union grievances involving meter readers, while Currier never participated in, nor was authorized to participate in, such matters. This difference is likewise undisputed. Finally, there is evidence that Carter participated in the budget process while he was a supervisor at Gardendale, while Currier was not involved in the budget process at all.

In response to defendant's showing, plaintiff makes several conclusory arguments that are not supported by the record. For example, she declares that "[h]er duties were similar to Mr. Carter's in all relevant respects . . . ." She makes the factually unsupported assertion that "[t]he fact that Ms. Currier was not allowed to complete employee evaluations, or even be given the training for same as a supervisor would be, was by design in order to maintain the facade that there was no supervisor slot in the Gardendale office for Ms. Currier to fill." She incorrectly states that the 30(b)(6) representative for defendant, John Sparks, said that Carter performed *only* clerical duties at the Gardendale office, when

19

he in fact stated that Carter *primarily* performed clerical duties, but also engaged in a number of supervisory activities. *See* Sparks Dep. at 13, 31-32, 46, 55.

As to a comparison of her job as Customer Service Specialist at the Gardendale office with Carter's post-1992 job of Meter Reading Supervisor at the Huffman office, the dissimilarities are even more apparent. As the Huffman Meter Reading Supervisor, Carter supervised the meter readers, loaded routes into hand held computers, handled any unread meters, handled customer calls, and made arrangements to have meters read. Moreover, Carter assumed the responsibility for meter reading for the entire district (which included the Gardendale, Huffman, and Leeds offices) including the day-to-day routing of the meter readers, the coordination of the meter readers, and ensuring that there was an adequate number of people to get meters read in Huffman, Gardendale, and Leeds. He provided some customer service support for the Huffman office as needed and would occasionally ride on the trucks with the meter readers. Finally, he completed performance evaluations on the meter readers. After reviewing the record, the court is convinced that there are few if any facts to support Currier's assertion that her job duties as Customer Service Specialist were even remotely similar to the those of Carter as Meter Reader Supervisor. Although Currier has presented evidence that, according to her supervisor Henry Gilbert, her job was more strenuous than Carter's, this fact alone does not support the necessary similarity between the jobs that Currier must establish in order to make out a prima facie case. Summary judgment is therefore due to be granted as to this claim.

20

## 2.    Defendant's Legitimate, Nondiscriminatory Reasons

Even if the plaintiff could establish a prima facie case of age discrimination, summary judgment is appropriate for an entirely different reason. As noted above, when the plaintiff has carried her burden, the defendant is required to articulate, but is not required to prove, a legitimate, non-discriminatory reason for its disparate treatment of plaintiff. This is merely a burden of production which, if carried, then must be shown by the plaintiff to be merely a pretext for age discrimination. In the instant case, the defendant has come forward with several non-discriminatory reasons for having paid the plaintiff less than it paid Carter. Plaintiff, in response, has failed to point to any evidence from which any reasonable jury could find that the defendant's stated reasons are merely a pretext for discrimination.

The defendant has set forth four reasons why it did not pay Currier at the level of a supervisor. First, it points out that Currier was not a supervisor because there was no supervisor position available in the Gardendale office due to down-sizing in management positions and reorganization. Further, management at APCo determined that no supervisory position was needed for the Gardendale office. Moreover, defendant has indicated that there was some concern among the supervisors that if a supervisory position was created at the Gardendale office, a bid process would have to be put in place whereby the most qualified applicant would receive the position. While Currier was arguably qualified for the position, the supervisors were concerned that she might not have been the most qualified candidate and may have been displaced from the Gardendale office by the introduction of a new employee at the supervisory level there. Finally, defendant points out that it did not

21

pay plaintiff at the rate of a supervisory employee because she did not, and was not authorized to, perform traditional supervisory duties.

Even if the court were to discount the final reason put forward by the defendant by assuming that the plaintiff's job was sufficiently similar to Henry Carter's supervisory position such that she performed some supervisory functions, it is clear that the first three reasons put forward by defendant remain unchallenged. As the Eleventh Circuit noted in *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000), once the defendant has come forward with legitimate, non-discriminatory reasons for its actions, the plaintiff is under an obligation to "meet that reason head on and rebut it." This, the plaintiff has failed to do. In fact, the extent of plaintiff's response to defendant's proffered reasons is that Currier received better reviews than Carter and that all of the individuals who decided not to create a supervisor position at the Gardendale office were male. Plaintiff concludes her argument on the issue by stating that

> At the very least Ms. Currier has demonstrated pretext in the reason for her not being made supervisor and a reasonably informed jury could certainly determine that Mr. Booker and Mr. Ivey continued the misrepresentation or fraud to Ms. Currier to the effect there was no supervisor slot in order to milk her services as long as she worked.

Pla.'s Br. at 5-6. Currier has not demonstrated pretext and summary judgment is therefor due to be granted.

## B.   ADEA Discrimination

The court applies the same Title VII burden-shifting framework discussed above to claims brought under the ADEA. *See Chapman*, 229 F.3d at 1024. Thus, when, as in this case, there is no direct evidence of discrimination, the plaintiff is required to establish a

22

prima facie case.  The courts that have addressed the issue tend to agree that the prima facie case of wage discrimination under the ADEA is the same as under Title VII: the plaintiff must show that younger individuals performing a similar job were paid more by the employer. *See Lyoch v. Anheuser-Busch Companies, Inc.*, 139 F.3d 612, 616 (8th Cir. 1998); *Foster v. Arcata Associates, Inc.*, 772 F.2d 1453, 1466-67 (9th Cir. 1985) (overruled on other grounds); *Follas v. Bagley*, 2000 WL 251658, *2 (W.D. Ohio 2000); *Tumolo v. Triangle Pacific Corp.*, 46 F. Supp. 2d 410, 412 (E.D. Pa. 1999); *Spalding v. Oram Material Handling*, 1999 WL 760266, *4 (D. Kan. 1999).  Regardless of whether plaintiff has made out a prima facie case, though, it is clear, as under her Title VII gender discrimination claim, that she has not rebutted the legitimate, non-discriminatory reasons set forth by the defendant for not paying her at a supervisory level, as discussed in section IV.A.2. above.

Plaintiff's entire argument in her brief regarding her age discrimination claim is stated as follows:

> Ms. Currier's age claim is due to remain since a jury could reasonably find the Power Company considered Ms. Currier's age in maintaining its insistence no supervisor slot existed for Gardendale since the likelihood of Ms. Currier leaving at her age to find another job was very low.  Certainly Ms. Currier truthfully testified that she did not really know that age was a factor in the Power Company's decision, but the facts taken as a whole dictate against any dismissal of her claim.

Pla.'s Br. at 6.  Applying the same burden-shifting analysis as under Title VII, plaintiff has clearly not rebutted the legitimate, non-discriminatory reasons proffered by the defendant regarding why she was paid at a lower rate than Carter.  Summary judgment is therefore appropriate as to her age discrimination claim.

### C.    Title VII Constructive Discharge

The law in the Eleventh Circuit regarding claims of constructive discharge is clear.

In *Hipp v. Liberty National Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001), the Eleventh

Circuit stated:

> In evaluating constructive discharge claims, we do not consider the plaintiff's
> subjective feelings.  Instead, we employ an objective standard.  *Doe v.*
> *Dekalb County Sch. Dist.*, 145 F.3d 1441, 1450 (11th Cir.1998). "To
> successfully claim constructive discharge, a plaintiff must demonstrate that
> working conditions were 'so intolerable that a reasonable person in [his]
> position would have been compelled to resign.'" *Poole*, 129 F.3d at 553
> (*quoting Thomas v. Dillard Dep't Stores, Inc.,* 116 F.3d 1432, 1433-34 (11th
> Cir.1997)). The standard for proving constructive discharge is higher than the
> standard for proving a hostile work environment. . . . This circuit has required
> pervasive conduct by employers before finding that a hostile work
> environment existed or a constructive discharge occurred.  *See, e.g.,*
> *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1247 (11th Cir.1999) (en banc) (no
> sex-based hostile work environment where male supervisor (1) told female
> employee he was "getting fired up;" (2) rubbed his hip against employee's
> hip while smiling and touching her shoulder; (3) twice made a sniffing sound
> while looking at employee's groin area; and (4) constantly followed employee
> and stared at her in a very obvious manner), *cert. denied*, 529 U.S. 1068, 120
> S.Ct. 1674, 146 L.Ed.2d 483 (2000); *Poole*, 129 F.3d at 553 (issue of fact
> existed, precluding summary judgment for employer on constructive
> discharge claim, where plaintiff was "[s]tripped of all responsibility, given
> only a chair and no desk, and isolated from conversations with other
> workers") . . . .

*Hipp*, 252 F.3d at 1231. *See also Wilson v. S & L Acquisition Co., L.P.*, 940 F.2d 1429, 1436-37

(11th Cir. 1991) ("Question one, which the jury answered in the affirmative, asked, 'Did

plaintiff prove by a preponderance of the evidence that her working conditions were so

unpleasant that a reasonable person in her place would have felt compelled to resign?' R2,

Tab 83, p. 1. This question conformed with the law of this circuit for determining whether

an employee alleging discrimination was constructively discharged.")

24

In Currier's deposition, the following exchange occurred:

Q:   Okay. And what was the reason for you wanting to retire?
A:   I was ready. My husband was retired. He wanted me to retire and I
     went to my financial -- Michael Matlock, you have some papers from
     him, he said I could.
Q:   Okay.
A:   So --
Q:   When you say you were ready, does that mean you were ready to stop
     working, in general or ready to leave the power company, what do you
     mean by that?
A:   No, when I retired, I retired. I was ready to stop working.
Q:   Okay. Did anything the power company did or did not do with respect
     to you in the supervisor position have anything to do with your decision
     to retire?

A:   Probably I would have waited until -- if I had had the supervisor
position, making better money, I would have waited until I was fifty nine and
a half, but when I found out that I felt like I was not ever going to get that and
I found out I could afford to retire, that's when I decided that I would.

. . . .
Q:   Okay. Do you know one way or the other if you would have waited if
     you had been a supervisor?
A:   I can't tell you that.
Q:   Okay. Did your husband want you to retire?
A:   Oh, yes.
Q:   Because he wanted to spend more time with you, right?
A:   He wanted me right there.
. . . .
Q:   Good for you. Was there any type of retirement party for you?
A:   A big one, the best one I have ever been to.

Currier Dep. at 99-101. In announcing her decision to retire to her supervisor, Currier

wrote, "After thirty one years with Alabama Power Company, I have elected to take early

retirement. My last day at work will be March 31, 2000. I've enjoyed it all. 'Thanks for the

memories.'" Booker Aff. at Ex. A. When directly asked in her deposition about her

constructive discharge claim, Currier responded that her work conditions "weren't so

intolerable that [she] wouldn't stay on," though the fact that she had no hope of getting a

supervisor position "had something to do with [her] retiring early." Currier Dep. at 134.

In response to defendant's assertion that the foregoing evidence demonstrates that

plaintiff's constructive discharge claim is baseless, plaintiff notes only that the claim is due

to survive summary judgment because the fact that plaintiff was not promoted to supervisor

played some role in her decision to retire three and a half years early than she may have

retired had she been a supervisor. With nothing else to support her claim, the court is

convinced that summary judgment is due to be granted as to plaintiff's constructive

discharge claim. Simply put, the facts as presented by the parties do not even remotely

support a finding of constructive discharge.[11]

## V.  Conclusion

For the foregoing reasons, summary judgment is due to be granted on all of plaintiff's

claims. The court will enter an appropriate order in conformity with this memorandum of

opinion.

Done, this _**30**_ $^{th}$ of November, 2001.

Edwin Nelson
United States District Judge

---

[11]Defendant initially argues that plaintiff's constructive discharge claim is outside the scope of her EEOC charge. By finding the claim to be meritless, the court does not address this argument.